UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

CLAYTON E. BAKER,                         :
     Plaintiff                          :
                                        :
    v.                                  :        CIVIL ACTION NO.
                                        :        3:03cv1894(JCH)
STATE OF CONNECTICUT,                     :
DEPARTMENT OF CORRECTION,                 :
et. al.,                                  :
     Defendants.                        :        MARCH 8, 2006


**RULING ON PLAINTIFF'S MOTION TO AMEND COMPLAINT [Doc. No. 51-1] &
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. No. 48]**

**I.      FACTUAL BACKGROUND[1]**

The plaintiff, Corrections Officer Clayton Baker, is suing his former employer, the

defendant Connecticut Department of Corrections, and several individual defendants:

Peter J. Murphy, J. Philip Margeson, Jeffrey Gray, and Roberto Quiros.  He claims that

these individuals were involved in the investigation and decision-making process that

led the DOC to place him on administrative leave, terminate him, attempt to deny him

benefits, and deny his request for reinstatement in his position.  Baker, who is African-

American, alleges that these actions were motivated by racial discrimination.

These actions arose out of the investigation of a suicide of an inmate named

Daniel Cramer at the Hartford Community Correctional Center ("Hartford facility") on the

early morning of April 10, 2001 (or arguably late on the night of April 9).  Baker was the

officer assigned to Cramer's housing unit and was charged with conducting "tours" past

all of the inmates' cells every half-hour and more extensive "counts" of inmates several

---

[1]  Unless otherwise noted, the facts in this section are undisputed.

times during his shift.  Following an investigation, the DOC concluded that Baker had

failed to conduct certain mandatory tours and two required counts, and that he had

falsified his log entries to cover up missed tours and counts.  Baker asserts that he

missed only one tour and missed no counts.  The DOC also concluded that Corrections

Officer Brandon Spring, who relieved Baker while he was on a meal break, missed one

tour that he entered in the log book.  Baker was placed on administrative leave pending

the outcome of the investigation, Plf.'s Mem. Supp. Plf.'s Obj. to Defs.' Mot. Summ. J.

[hereinafter "Plf.'s Mem."], Ex.7.

Baker asserts that Spring was not placed on leave, a fact neither confirmed nor

denied by the defendants.  Both officers were then sent letters of termination, but

Spring's dismissal was rescinded following a hearing on his infraction that revealed that

he intended to conduct the tour he recorded in the log book but was interrupted by

Baker's return from his break.  Spring is not African-American.  Baker grieved his

termination, and his grievance was denied.  He was not reinstated.  He was

subsequently disqualified from receiving unemployment compensation benefits, but he

prevailed upon appeal of this denial of benefits because the Appeals Referee of the

Connecticut Employment Security Appeals Division found that he was terminated for

reasons other than wilful misconduct.  Decision of Appeals Referee, Case No. 2860-

AA-01, Feb. 22, 2002,   Plf.'s Mem. Ex. 28 [Doc. No. 51-4].  Defendant Quiros, who is a

DOC investigator, and a DOC personnel officer testified against Baker at the benefits

appeal.  Id.  The involvement of individual defendants in the events above will be

discussed in greater detail below.

2

II.    **MOTION TO AMEND COMPLAINT**

As a preliminary matter, the court grants Baker's motion for leave to amend his Complaint "for the purposes of withdrawing the Complaint as to named defendants Theresa C. Lantz, Robert C. Jackson, and Donald T. Kruk, conforming the pleadings to factual information gathered in the course of discovery in this matter and making such other corrections as are necessary or appropriate at this stage of the proceedings." Defendants Lantz, Jackson, and Kruk will be terminated.  The motions for summary judgment by these three defendants are denied as moot.

Baker has represented through his counsel that the amended Complaint will "abandon Count One with respect to declaratory and/or injunctive relief, thereby seeking only monetary damages against the DOC for the Title VII claim and monetary damages against the named individual Defendants, in their personal capacity, for the §1983 claim." Plf.'s Mem. [Doc. No. 51-2].  The court notes that Count One of the Complaint contains only a claim for declaratory judgment, and that Baker's claim for injunctive relief, asserted only against individual defendants acting in their official capacities, is actually contained in Count III.  However, in light of Baker's statement that he will be seeking "only monetary damages," as well as his later statement that the issue of whether the Eleventh Amendment bars suits for injunctive relief is moot "inasmuch as Plaintiff expects to withdraw all claims for equitable relief," Plf.'s Mem. at 25, the court understands that Baker is withdrawing both Count I and the claim for injunctive relief contained in Count III.  The court will therefore deny as moot the defendants' motion for summary judgment with respect to Count I and part of Count III, insofar as it names individual defendants in their official capacity.

3

## III.   MOTION FOR SUMMARY JUDGMENT

### A.   Introduction

In light of the court's ruling on the motion to amend the Complaint, the claims

remaining are as follows:

- Count II:  Title VII claim against the DOC, alleging that the DOC's suspension of, termination of, attempted denial of benefits to, and denial of reinstatement to Baker constituted disparate treatment on account of his race; and

- Count III: 42 U.S.C. § 1983 claim, alleging that Peter J. Murphy, Phil Margeson, Jeffrey Gray, and Roberto Quiros ("individual defendants"), in their individual capacities but under color of state law, violated Baker's rights under 42 U.S.C. § 1981.

The defendants move for summary judgment on both of these claims.

### B.   Standard of Review

In a motion for summary judgment, the burden lies on the moving party to

establish that there are no genuine issues of material fact in dispute and that it is

entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c)); Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); SCS Communications, Inc. v. Herrick Co., 360

F.3d 329, 338 (2d Cir. 2004).  The moving party may satisfy this burden "by showing –

that is pointing out to the district court – that there is an absence of evidence to support

the nonmoving party's case."  PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d

Cir. 2002) (per curiam) (internal quotation marks and citations omitted); accord

Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

A court must grant summary judgment "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is

no genuine issue as to any material fact . . . ."  Miner v. City of Glens Falls, 999 F.2d

4

655, 661 (2d Cir. 1993) (internal quotation marks and citation omitted).  A dispute regarding a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson, 477 U.S. at 248), cert. denied, 506 U.S. 965 (1992).  After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide."  Aldrich, 963 F.2d at 523 (internal citation omitted).  Thus, "'[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper.'"  Id. (quoting Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991), cert. denied, 502 U.S. 849 (1991)); see also Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992) ("Viewing the evidence in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is inappropriate.").  "'If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'"  Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) (quoting Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996)).

When a motion for summary judgment is supported by sworn affidavits or other documentary evidence permitted by Rule 56, the nonmoving party "may not rest upon the mere allegations or denials of the [nonmoving] party's pleading." Fed. R. Civ. P. 56(e); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). Rather, "the [nonmoving] party's response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial" in order to avoid summary judgment.  Id.  "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture."  Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir.1990) (internal quotations and citations omitted). Similarly, a party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible.  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

**C.   DISCUSSION**

**1.  Title VII Claim Against the DOC**

**a.  Eleventh Amendment Immunity**

The Title VII claim against the DOC is not barred by Eleventh Amendment sovereign immunity, because Title VII itself abrogates this immunity.  See Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976).

**b.  Burden-Shifting Framework**

The court analyzes the motion for summary judgment on the Title VII claim using the burden-shifting analysis first announced in McDonnell Douglas Corp. v. Green, 411

6

U.S. 792, 802 (1973).[2]  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-149 (2000); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-511 (1993); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-256 (1981).

The initial burden lies with the plaintiff.  To establish a prima facie case, the plaintiff must show (1) that he was within a protected class, (2) that he was qualified for the position he held, (3) that he suffered an adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination based on a protected ground (in this case, race).  See McDonnell Douglas, 411 U.S. at 802.  Once a plaintiff has established a prima facie case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for its actions.  See Burdine, 450 U.S. at 254.  Upon the articulation of such a non-discriminatory reason for the employment action, the presumption of discrimination that arose with the establishment of the prima facie case drops out, see St. Mary's Honor Ctr., 509 U.S.  at 510-11, and the burden shifts back to the plaintiff to fulfill his ultimate burden of proving that the defendant intentionally discriminated against him in the employment action.  Reeves, 530 U.S. at 143.  In order to satisfy this burden, the plaintiff may attempt to prove that the legitimate, non-discriminatory reason offered by the defendant was not the employer's true reason, but was a pretext for discrimination.  Id.  A prima facie case combined with a showing that

---

[2]  Some courts have declined to apply the McDonald Douglas-Burdine-Hicks burden-shifting analysis to Title VII claims following the Supreme Court's decision in Desert Palace, Inc. v. Koster, 539 U.S. 90 (2003).  E.g., Dare v. Wal-Mart Stores, Inc., 267 F.Supp.2d 987(D.Minn.2003).  However, the Second Circuit continues to apply the burden-shifting analysis.  See, e.g., Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005) (applying McDonnell Douglas in a summary judgment context); Feingold v. New York, 366 F.3d 138 (2d Cir. 2004) (same).

an employer's asserted justification is false is sometimes, but not always, sufficient to permit a discrimination claim to survive summary judgment.  Schnabel, 232 F.3d at 89-91 (citing Reeves, 530 U.S.).  The court must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'"  Schnabel, 232 F.3d at 90 (quoting Reeves, 530 U.S. at 143).

### c.  Discriminatory Discharge

The court begins with the claim of discriminatory discharge, because the defendants' memorandum focuses primarily on this claim.  To establish a prima facie case of discriminatory discharge, Baker must show:  "(1) that he belongs to a protected class, (2) that he was performing his duties satisfactorily, (3) that he was discharged, and (4) that his discharge occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class."  McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).  The DOC concedes Baker is a member of a protected class and that he was discharged.  It argues, however, that Baker has not provided evidence that he performed his duties satisfactorily, or that his termination gave rise to an inference of racial discrimination.

> With respect to the second prong of the test, the Second Circuit has held,
> In a discharge case in which the employer has already hired the employee
> into the job in question, the inference of minimal qualification is, of course,
> easier to draw than in a hiring or promotion case because, by hiring the
> employee, the employer itself has already expressed a belief that she is
> minimally qualified. An employer's dissatisfaction with even a qualified
> employee's performance may, of course, ultimately provide a legitimate,
> nondiscriminatory reason for the employer's adverse action. But the
> crucial point remains the same: the qualification prong, as to which the
> initial burden lies on plaintiff, cannot be transformed into a requirement
> that the plaintiff anticipate and disprove an employer's explanation that

8

inadequate ability or performance justified the job action at issue.

Gregory v. Daly, 243 F.3d 687, 696-97 (2d Cir. 2001).  To show "qualification" sufficient

to shift the burden of providing some explanation for discharge to the employer, the

plaintiff "need not show perfect performance or even average performance." Id.

Instead, the plaintiff need only make the "minimal showing" that he "possesses the

basic skills necessary for performance of [the] job." Owens v. New York City Housing

Auth., 934 F.2d 405, 409 (2d Cir. 1991) (internal quotation marks omitted).

　　　　In light of this standard, the court finds a genuine issue of material fact as to

whether Baker was performing his duties satisfactorily for purposes of the prima facie

case.  Although the record contains undisputed evidence that the DOC dismissed

Baker from state service for sleeping on the job in 1988, this temporary dismissal

occurred roughly twelve years before the incident that precipitated Baker's 2001

termination the DOC, and Baker was reinstated following a hearing.  The other

incidents that the DOC brings to the court's attention – counseling in 1992 for tardiness,

a 1991 warning letter regarding negligence of duty, and a 1995 informal counseling

memo for calling in sick too frequently – are similarly divorced in time from the 2001

incident, and did not convince the DOC that Baker's performance was so unsatisfactory

that he should be terminated, nor even formally disciplined.  In its termination letter of

August 7, 2001, the DOC referred solely to allegations that Baker had failed to take

several mandatory tours and two required counts on the morning that  Kramer

committed suicide and that he had falsified his log entries on that morning. Def.'s Mem.

Ex. 19 [Doc. No. 48-4].

Baker, for his part, attested that he made all counts that were required before he was relieved of duty and most of the required tours, although he admits to having neglected to take the required 12:30 a.m. tour.  Baker Aff., Plf.'s Mem. Ex. 35 at 18-27 [Doc. No. 51-4].  He also admits that he did not verify the existence of "living, breathing flesh" in Kramer's cell, as required by Administrative Directive 6.3, Def.'s Mem. Ex. 5 [Doc. No. 48-4], but contends that to do so was "impossible," Baker Dep. At 42:9-22, Id. Ex. 6.  Despite this evidence, his long history of employment with the DOC shows that he possessed "the basic skills necessary for performance" of his job.  Owens, 934 F.2d at 409.

Turning to the fourth factor of the test, the court must determine whether Baker has adduced evidence sufficient to create a genuine issue of fact showing that his firing occurred under circumstances giving rise to an inference of discrimination.  The only evidence that Baker offers in support of this prong is evidence that, he claims, shows that he was treated less favorably than similarly situated employees outside of his protected group.  This type of showing of disparate treatment  "is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case." Mandell v. Cty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (internal citation omitted). Evidence that even one similarly situated employee outside of the protected group received treatment more favorable than the plaintiff may raise an inference of discriminatory intent.  See, e.g., McGuinness v. Lincoln Hall, 263 F.3d 49, 54-55 (2d Cir. 2001) (holding that a showing that one similarly situated employee outside the plaintiff's protected group was treated more favorably than the plaintiff was sufficient to make out fourth element of a prima facie case); Graham v. Long Island R.R., 230 F.3d

10

34, 42 (2d Cir. 2000) ("That Elmendorf, a white employee, then received a second last chance waiver upon his second violation of the Policy, while Graham, a black employee, did not, raises an inference that Graham's dismissal for the second violation was a result of race discrimination.").

"Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury." Id. To be "similarly situated," the individuals with whom Baker attempts to compare himself need not be similarly situated "in all respects," but must be "similarly situated in all material respects." McGuinness v. Lincoln Hall, 263 F.3d 49, 53-54 (2d Cir. 2001) ("The magistrate judge interpreted Shumway to mean that another employee cannot be similarly situated to a plaintiff unless the other employee had the same supervisor, worked under the same standards, and engaged in the same conduct. This was a misreading of Shumway.") (citing Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)); Graham, 230 F.3d at 39 (citing Shumway, 118 F.3d at 63). "In other words, where a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." McGuinness, 263 F.3d at 54.

> What constitutes "all material respects" [ ] varies somewhat from case to case and . . . must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness. . . . In other words, there should be an objectively identifiable basis for comparability.  Hence, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical. . . . The determination that two acts are of comparable seriousness requires -- in addition to an

11

examination of the acts -- an examination of the context and surrounding circumstances in which those acts are evaluated.

Id. at 40 (internal citations and quotation marks omitted).

Baker alleges that several corrections officers, who were not black, committed similar or more egregious acts or omissions and yet were not discharged.  With respect to the initial discharge, the court finds insufficient evidence that Spring was treated differently from Baker, because they were both discharged.[3]  However, the court finds a genuine issue of fact as to whether several other officers who were similarly situated received more favorable treatment.[4]  In particular, it notes that Corrections Officers Patrick Maia and James Guererro appear to have been similarly situated, yet received more favorable treatment. They were employed as corrections officers at the DOC, although Maia was working at a different correctional facility from Baker.  Maia and Guerrero were subject to the same workplace standards as Baker, as stated in the Administrative Directives.  Although Baker does not point to specific evidence that they are not African American, the defendants do not dispute that the other officers were of other races. The court finds a genuine issue of material fact as to whether Corrections

[3]  The court will discuss the separate claim of denial of reinstatement separately below.

[4]   However, the court does not find that every officer that Baker argues was similarly situated was in fact so situated. Baker has not presented evidence that Lieutenant Carl Lovisolo was similarly situated, because the DOC investigatory report Baker has submitted found merely that Lovisolo had recorded a tour before performing it and later altered his entry to reflect that he recorded it before the actual tour, and not that he had actually neglected to perform any tours.  Plf.'s Mem. Ex. 14 at 9.  It also finds that Officer Paul Sampson, even if he was similarly situated, did not receive disparate treatment with respect to termination.  He was initially disciplined in the same manner as Baker, by termination, and reinstated following a hearing.  Id. Ex. 16.

The court notes that, in addition to those corrections officers mentioned in the Complaint as being "similarly situated," Baker has provided the court with exhibits regarding discipline of a number of other officers.  However, Baker does not explain in his memoranda or Rule 56(a) statements why these officers should be considered similarly situated to him.

Officer Maia committed comparable violations to Baker's when Maia neglected to perform tours on July 13, 2000.  See Letter from Warden Mary Johnson to Maia, Plf.'s Mem. Ex. 15 at 10.  Maia was not initially given a termination letter, but rather a thirty-day suspension.  Id.  Baker also presented sufficient evidence whereby a reasonable jury could find that the action of Corrections Officer James Guerrero, who was disciplined with a written reprimand but not terminated for holding a towel over the head of an inmate who was in four-point restraints "in a position that minimized [his] and other's [sic] ability to make continuous observations of the inmate's condition," was comparable or more serious than that of Baker, especially in light of the fact that the inmate died during the incident.  See Id. Ex. 17.

The DOC has proffered a legitimate, non-discriminatory reason for the termination: Baker's violation of the Administrative Directives by missing tours and counts and falsifying his log book.  However, with regard to the pretext inquiry,

> A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for racial discrimination. . . . Were a jury to find on these facts that there was disparate treatment in [the defendant]'s disciplining of plaintiff when compared to similarly situated employees, it could also find that [the defendant]'s proffer of a non-discriminatory reason for [the plaintiff]'s dismissal was pretextual. . . . Such would preclude the grant of summary judgment to the employer under the third prong of McDonnell Douglas.

Graham, 230 F.3d at 43 (internal citations omitted) (finding that claim survived summary judgment based upon evidence that two similarly-situated employees outside the protected group were treated more favorably than plaintiff, even though employer had also proffered evidence that an employee in the protected group was treated more favorably than the plaintiff).  A showing that a similarly situated employee outside the

protected group was treated more favorably is not always sufficient to permit a disparate treatment claim to survive summary judgment even when combined with a showing of pretext, but it is not necessarily insufficient. <u>See</u> <u>McGuinness</u>, 263 F.3d at 55-56.  On the present record, the court finds sufficient evidence of pretext and disparate treatment to permit the Title VII termination claim to survive summary judgment.  If a jury credits Baker's testimony that the DOC exaggerated the extent of his infractions, it could reasonably find that its explanation for terminating him was pretexual even without the evidence of disparate treatment.  Combining an independent finding of pretext with the evidence of disparate treatment of Maia and Guerrero, a reasonable jury could find that Baker has made the required showing that his termination was motivated by racial discrimination.  The question of the intent of the individuals who influenced and made the termination decision therefore cannot be resolved at summary judgment.

### d.  Other Alleged Adverse Employment Actions

Baker's Title VII claim also alleges several other adverse employment actions: suspension, attempted denial of benefits, and denial of reinstatement.  All of these actions resulted from the April 10, 2001 incident that led to Baker's termination, and the analysis above is relevant to each of these claims.  However, the court must separately consider whether each of these actions could amount to an adverse employment action in light of the current record, and whether Baker has proffered evidence of disparate treatment with respect to each of these actions.  As a general matter,

> An adverse employment action is a materially adverse change in the terms and conditions of employment . . . .  To be "'materially adverse,' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." . . . Such a change

14

"might be indicated by a termination of employment, a demotion
evidenced by a decrease in wage or salary, a less distinguished title, a
material loss of benefits, significantly diminished material responsibilities,
or other indices ... unique to a particular situation."

Weeks v. New York State (Div. of Parole), 273 F.3d 76, 85 (2d Cir. 2001), abrogated on
other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 108-114 (2002)
(quoting Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)).
"[A]dverse employment actions are not limited to 'pecuniary emoluments,'" Treglia v.
Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002).

                                    i. Administrative Leave.  Baker's forced administrative
leave, which appears to have lasted roughly four months, could constitute an adverse
employment action because it involved "significantly diminished material
responsibilities" over a significant period of time, such that it could be very disruptive to
his career even if he had not been terminated at the end of the leave and even though
he was suspended with pay.  Moreover, Baker has attested that, to his knowledge,
Corrections Officer Spring, who is not African-American, was not suspended during the
investigation.  Baker Aff., Plf.'s Mem. Ex. 35 ¶ 31.  Baker has proffered sufficient
evidence to create a genuine issue of fact as to whether he and Spring were "similarly
situated."  Spring and Baker appear to have been similarly situated with respect to
workplace standards, insofar as they both were accused of violating some of the same
Administrative Directives.  See Def.'s Mem. Ex. 18 & 19 [Doc. No. 48-4].  With regard to
the seriousness of their conduct, the DOC argues that it treated Spring more favorably
than Baker because Spring missed only a "tour," whereas Baker's violation of missing a
"count" was more serious.  See Munroe Dep., Def.'s Mem. Ex. 11 at 121:11-18.
Munroe, a DOC personnel officer, also testified that he considered the fact that Spring

15

was younger, with no disciplinary record. Id. Even if missing a "count" were found to be significantly more serious than missing a "tour," a genuine issue of material fact exists as to whether Baker in fact missed any count while on duty. See Baker Aff. ¶ 29 (attesting that he made all required counts). If, as he testified, Baker missed only one tour and no counts, he committed precisely the same infraction as Spring. Moreover, the decision to place Baker on administrative leave was made immediately after Cramer's suicide, before the investigation was completed, so it is not clear that the DOC had concluded that Spring's infraction was less severe than Baker's at the time of the suspension decision. In light of its previous analysis of Baker's disciplinary record in the discussion of his qualification for his job, the court does not find the difference in the two officers' disciplinary records significant enough to render their conduct not comparable. It finds that Baker has established a genuine issue of material fact as to whether Spring was similarly situated, and there is at least a genuine issue of fact that Spring was not placed on leave. Therefore, the comparison to Spring alone is sufficient to make out the inference of discriminatory intent required for a prima facie case of discriminatory suspension. Indeed, the court finds a genuine issues of material fact as to whether Spring and Baker were so similarly situated as to be in nearly identical positions at the time of Baker's suspension (i.e., that they were both corrections officers at the same facility, subject to investigation by the same DOC investigators and discipline by the same DOC supervisors, and having committed identical infractions on the same night and the same ward). Even assuming that the DOC can articulate a legitimate, non-discriminatory reason for the suspension, the court finds that a showing that the DOC exaggerated Baker's infractions could show pretext, and that the

16

potentially extensive similarities between Spring and Baker could create a strong enough inference of racial discrimination to carry Baker's summary judgment burden on this claim.

ii. Denial of Reinstatement.  Denial of reinstatement is also an adverse employment action.  See Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 234 (2d Cir. 2000) (holding, with respect to an Americans with Disabilities retaliation claim, that "[a] claim of refusal to rehire an individual" was an adverse employment action) (internal citations omitted).  Baker has presented specific evidence of disparate denial of reinstatement.  In particular, it is undisputed that Spring was reinstated following his initial termination. The previous discussion of the relative infractions of Baker and Spring applies to the claim of discriminatory denial of restatement. Baker has also presented evidence that Paul Sampson, a corrections officer at another DOC facility who was not African-American, was found to have committed "gross neglect of duty" by skipping and falsifying numerous tours, yet was reinstated to his employment following a hearing and instead given a thirty-day suspension.  See Plf.'s App. Ex. 16. Thus, there is a genuine issue of fact as to whether Baker and Spring, and Baker and Sampson, were similarly situated.  The court finds that this evidence of disparate treatment is sufficient for the claim to survive summary judgment under the burden-shifting analysis.

iii.  Attempted Denial of Benefits.  In contrast to the other actions, the DOC's efforts to convince another state agency to deny Baker unemployment benefits do not amount to an adverse employment action.  See Trigg v. N.Y. City Transit Auth., No. 99-CV-4730 (ILG), 2001 U.S. Dist. LEXIS 10825, at *10,

(S.D.N.Y. 2001) ("Neither the reprimand, the denial of Trigg's transfer request, nor the effort to deny unemployment benefits amount to "adverse employment actions.") (citing Roman v. Cornell Univ., 53 F. Supp. 2d 223, 245 (N.D.N.Y. 1999) ("in the context of a former employee's application for unemployment benefits, that opposition to the application for benefits, particularly when that employee has been dismissed for cause, is not an adverse employment action") (quote from Trigg).  Indeed, despite any efforts by the DOC, the Connecticut Employment Security Appeals Division ultimately awarded unemployment benefits to Baker.

The court therefore grants summary judgment on the claim of discriminatory attempted denial of benefits, although not on the other three claims discussed above. The grant of summary judgment on the claim of discriminatory denial of benefits applies both to the Title VII claim against the DOC and the section 1983 claim against the individual defendants.  Thus, the discussion of the section 1983 claim below will focus solely on the other three adverse employment actions.

## 2.  Claims Against Individual Defendants

### a.  Eleventh Amendment Immunity

Insofar as the individual defendants argue that the claims against them are barred by sovereign immunity, this argument is unavailing because the only remaining claims against them are brought in their individual capacities.  See Alden v. Maine, 527 U.S. 706, 757 (1999) ("Even a suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought not from the state treasury but from the officer personally.") (internal citations omitted); see also Part II.A.,

supra.

### b.  Section 1983 Action for Violation of Section 1981

To make out a cause of action under section 1983, a plaintiff must establish that the defendant, acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory," caused him to be deprived of "any of the rights, privileges, or immunities secured by the [United States] Constitution and Laws." Id.  In his section 1983 action, Baker alleges that the individual defendants, acting under color of state law, violated his rights as protected by section 1981.  An action pursuant to section 1983 is a proper, indeed the exclusive, means by which a plaintiff may recover damages from a state actor for a violation of section 1981.  Jett v. Dallas Independent Sch. Dist., 491 U.S. 701, 713-34 (1989).[5]

The individual defendants do not dispute that they were acting under color of state law.  Rather, they argue that Baker has not proffered sufficient evidence of their personal involvement to make out a section 1983 claim, and that Baker has not otherwise proffered sufficient evidence to make out a 1981 claim.    In determining whether the plaintiff has proffered evidence that could be sufficient to establish a violation of section 1981 by the individual defendants, the court applies the same burden-shifting analysis it applied with respect to the Title VII claim against the DOC.  See Part III.C.1.b., supra; McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997) (applying same prima facie test to Title VII and section 1981 claims); Jackson v. Health Resources of Rockville, Inc., 357 F.Supp.2d 507, 514 (Hall, J.) (holding that Title VII

---

[5]  Although the defendants' memorandum implies that Baker has pled a violation of section 1981 that is independent from his section 1983 claims, Baker has in fact pled a violation of section 1981 only as part of his section 1983 claims.  See Compl., Count III [Doc. No. 1].

and section 1981 race-based employment discrimination claims are analyzed under

McDonnell-Douglas framework).[6]

Liability under both section 1981 and section 1983 also requires a showing of

personal involvement by the plaintiff.  Patterson v. Cty. of Oneida, 375 F.3d 206, 229

(2d Cir. 2004). The doctrine of respondeat superior does not apply to section 1983

actions.  Blyden v. Mancusi, 186 F.3d 252, 264 (2d Cir. 1999).  The requisite personal

involvement may be established by evidence that:

> (1) the official participated directly in the alleged constitutional [or
> statutory] violation; (2) the official, after being informed of the violation
> through a report or appeal, failed to remedy the wrong; (3) the official
> created a policy or custom under which unconstitutional practices
> occurred or allowed the continuance of such a policy or custom; (4) the
> official was grossly negligent in supervising subordinates who committed
> the wrongful acts; or (5) the official exhibited deliberate indifference to the
> rights of others by failing to act on information indicating that
> unconstitutional acts were occurring.

Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 254 (2d Cir. 2001) (internal

citation and brackets omitted).  "'[D]irect participation' as a basis of liability in this

context requires intentional participation in the conduct constituting a violation of the

victim's rights by one who knew of the facts rendering it illegal."  Provost v. City of

Newburgh, 262 F.3d 146, 155 (2d Cir. 2001).  The phrase "direct participation" "does

not foreclose the liability of a person who, with knowledge of the illegality, participates in

bringing about a violation of the victim's rights but does so in a manner that might be

said to be 'indirect' – such as ordering or helping others to do the unlawful acts, rather

---

[6]  Although the parties state the elements of a section 1981 claim in a different manner,
they rely on a case reviewing a ruling on a motion to dismiss. See Mian v. Donaldson, Lufkin &
Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993).  In light of the recent Second Circuit
cases cited above, the court will apply the McDonnell Douglas burden-shifting framework for
purposes of a summary judgment motion on a section 1981 claim.

than doing them him- or herself." Id.

The court's holdings in regard to the first three elements of the Title VII prima facie case apply equally to the section 1983 / section 1981 claims by each of the individual defendants. That is, for section 1981 purposes, just as for Title VII purposes, Baker has proffered sufficient evidence to establish that he is in a protected class, that he was qualified for his job, and that he suffered the adverse employment actions of suspension, termination, and denial of reinstatement. The court will now address the issue of discriminatory intent separately for each individual defendant, as this issue is related to the defendant-specific question of personal involvement.

Murphy was the warden of the Hartford facility at the time of Baker's termination, and he signed the administrative leave letter sent to Baker, Plf.'s Mem. Ex. 7. Murphy testified to having no direct involvement in the investigation of Baker's conduct, Murphy Dep., Def.'s Mem. Ex. 8 at 88:14-88:18. However, Baker presents testimony that could lead a reasonable jury to find that Murphy did participate directly, as that term is defined above, in the suspension, termination, and denial of reinstatement to Baker. In addition to the letters, the record contains evidence that Murphy reviewed the video tape recorded at the Hartford facility on the night of Cramer's suicide, as well as a report on the tapes' content, and that Murphy briefed the investigators upon their arrival at the facility on the morning of April 10, 2001, suggesting personal involvement in the investigation. See Gray Dep., Plf.'s Mem. Ex. 23 at 48:9-49:23; 74:14-76:4 (stating that Murphy was among the officers who viewed the tapes and that he briefed investigators); Quiros Dep., id. Ex. 22 at 51:23-52:6 (stating that Murphy reviewed the tape); Contraband/Criminal Physical Evidence Tag and Chain of Custody document

21

dated 04/10/01, Plf.'s Mem. Ex. 5 (showing that Murphy received the prison videotape recorded on the night of the incident to review as "evidence" in the investigation of Cramer's suicide); Memo from Major M.R. Collins to Warden Peter Murphy, 04/10/01, id. Ex. 6 (listing tours observed on the prison videotapes recorded on the early morning of the same day).  Murphy also acknowledged that an Administrative Directive stating particular factors that someone in his position should consider in determining what disciplinary action to take against a supervisee implies that someone in his position would make this determination.  Id. at 45:13-46:7; see Administrative Directive 2.6 ¶ 7.  Although he contended that this Directive was "not correct," Murphy Dep. At 45:13-46:7, a jury could reasonably credit the terms of the directive over Murphy's testimony.  See also Administrative Directive 2.6, Plf.'s Mem. Ex. 1 at ¶ 4 (supervisor has responsibility for maintaining discipline at work unit).  Moreover, Murphy conceded that he could "voice his opinion" on disciplinary recommendations.  Murphy Dep. at 45:7-12.

In light of all of the evidence on the record, the court finds a genuine issue of material fact as to whether Murphy possessed and exercised the authority to influence the investigation and decision-making process that led to Baker's administrative suspension, termination and denial of reinstatement. Although the record contains no direct evidence that Murphy influenced the decisions to discipline and terminate Baker with discriminatory animus, the circumstantial evidence of the disparate treatment of Spring and Baker with regard to two of the three adverse employment actions -- suspension and denial of reinstatement -- could lead a reasonable jury to find that Murphy acted with discriminatory intent as to the suspension and denial of restatement. Similarly, the evidence that Murphy signed the disciplinary letter reprimanding, but not

terminating Guerrero, for the incident in which he covered an inmate's face with a towel, and in which the inmate died, could support an inference that Murphy acted with discriminatory intent with respect to Baker's termination.  Plf.'s Objection to Def.'s Mot. Summ. J. Ex. 17 [Doc. No. 51-4].  Even assuming that Murphy has proffered a legitimate, non-discriminatory reason for his termination, the evidence of pretext and discriminatory intent discussed in the Title VII section permits the section 1983 claims against Murphy (with the exception of the attempted denial of benefits claim) to survive summary judgment.

Lieutenant Quiros and Captain Gray were Security Division officers assigned to investigate Cramer's suicide.  Baker concedes that they lacked the "authority to impose discipline or place anyone on Administrative Leave."  Plf.'s Mem. at 10 [Doc. No. 51-2]. However, the record contains evidence from which a reasonable jury could find personal involvement by Quiros and Gray in the decision-making process that led to Baker's suspension, termination, and denial of reinstatement, even though they did not make the final decisions.  See Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 132 (holding that supervisors who evaluated plaintiff teacher negatively and recommended against her receiving tenure, allegedly on discriminatory grounds, were personally involved in the decision to deny her tenure even though they did not make the official decision to do so).   Indeed, Baker contends that the conclusions of their investigation were the reason for the disciplinary action against Baker, and the lesser disciplinary action against Spring.  Baker has presented sufficient evidence to establish that Quiros and Gray conducted the investigation into Baker's and Spring's conduct. He has proffered evidence that creates a genuine issue of fact as to whether Quiros's

and Gray's conclusion that Baker skipped five tours and two counts, whereas Spring missed only one tour, see Plf.'s Mem. Ex. 9 at 9 [Doc. No. 51-4], influenced the DOC's decision to deny Baker reinstatement while reinstating Spring.  The record contains some evidence from which a jury might conclude that the two investigators interpreted the evidence they found in a manner unfavorable to Baker.  See, e.g., Mem. from Quiros and Gray to Vincent Santopietro, Plf.'s Mem. Ex. 9 (describing investigation and concluding that Baker failed to conduct five tours and one count and that Spring missed one tour); Gray Dep., Plf.'s Mem. Ex. 23 at 32:24-34:13; 54:20-55:20; 61:24-66:8 (discussing discrepancies in timing among Baker's reported activities, the timing device on the prison videotapes that Gray reviewed, and the facility clock, as well as the fact that the videotapes did not show Spring conducting any tours).  Therefore, with respect to the denial of reinstatement claim, the court finds that Baker has presented sufficient evidence that Quiros and Gray acted with discriminatory intent in a manner that influenced Baker's denial of reinstatement.

However, it does not find sufficient evidence to support individual liability by Quiros or Gray with respect to the initial suspension, as there is no evidence that their investigation had any impact on the initial decision to suspend Baker pending the results of the investigation.  Baker similarly has failed to present evidence that Maia or Guerrero, the two officers who may have been similarly situated yet were not terminated, were investigated by Quiros or Gray.  Although Quiros and Gray did investigate Spring's conduct, he was terminated just as Baker was.  Therefore, the section 1983 / section 1981 claim against Quiros and Gray cannot survive insofar as it is based on discriminatory termination, and a reasonable jury could draw an inference

24

of discriminatory intent by Gray and Quiros only with regard to denial of reinstatement.

Assuming that these defendants can articulate a legitimate, non-discriminatory reason for Baker's discharge, the evidence of pretext and discriminatory intent discussed in the Title VII section permits the section 1983 claim against them for discriminatory denial of reinstatement to survive summary judgment.

Margeson was a hearing officer from the Office of Labor Relations.  Although Margeson did not have a reporting requirement to anyone at the DOC, he did function as an "employer representative" during the course of his duties with regard to the investigation, adjudication, or other disposition of grievances such as those filed by Baker and Spring after their initial terminations.  Indeed, he was the individual who made the decision that Spring should be reinstated to his position following his grievance hearing, see Plf.'s Mem. Ex. 27, and that Baker's grievance seeking reinstatement would be dismissed, see Margeson Dep., Plf.'s Mem. Ex. 12 ¶ 27, 30. He also conducted some activities that might be considered investigation, such as interviewing Quiros, Gray, and another Lieutenant.  Id. at ¶ 32.  Margeson, in his written deposition testimony, stated that, to the best of his recollection, Baker did not appear for his scheduled "Step III" grievance hearing, id. ¶ 25, which could suggest a difference between his situation and that of Spring.  However, Margeson also responded in the negative to a question of whether his response to Baker's grievance conference, in which he affirmed the dismissal, was consistent with his response to that of Spring, whom he reinstated.  Id. ¶ 30.  Although the court finds that counsel's question to Margeson in paragraph 30 used the word "consistent" in a vague and confusing way, the answer could be read to suggest that Margeson himself felt that the disciplinary

25

measures against the two corrections officers were unduly disparate.  Taken as a whole
and viewed alongside the evidence discussed with regard to the Title VII claim, the
evidence of Margeson's personal involvement is sufficient to make out the fourth
element of the prima facie case for purposes of the section 1983 / section 1981 denial
of reinstatement claim, and to carry Baker's ultimate burden under McDonnell-Douglas.
However, the record contains no evidence of his personal involvement in the initial
suspension or termination.

For the reasons stated above, the court finds that Baker has presented sufficient
evidence to satisfy his burden with respect to all of those claims in Count III that he is
still pursuing, with the exception of the claims of discriminatory suspension and
discharge against Quiros, Gray, and Margeson, and of any claims premised on
attempted denial of unemployment benefits.

### c.  Affirmative Defense:  Qualified Immunity

The individual defendants argue that they are entitled to qualified immunity.
"[G]overnment officials performing discretionary functions[7] generally are shielded from
liability for civil damages insofar as their conduct does not violate clearly established
statutory or constitutional rights of which a reasonable person would have known."
Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "For a defendant to secure summary
judgment on the ground of qualified immunity, he must show that no reasonable jury,
viewing the evidence in the light most favorable to the Plaintiff, could conclude that the
defendant's actions were objectively unreasonable in light of clearly established law."

---

[7]  Baker does not dispute that the individual defendants are government officials
performing discretionary functions.  See Plf.'s Mem. Supp. Plf.'s Objection to Defs.' Mot Summ.
J. at 23 [Doc. No. 51-2].

Ford v. Moore, 237 F.3d 156, 162 (2d Cir. 2001).  When reviewing a claim of qualified

immunity for a constitutional violation, the court first asks whether a clearly established

right is at stake.  Blue v. Koren, 72 F.3d 1075, 1084 (2d Cir. 1995) (internal citation

omitted).  In the present case, the right in question is statutory in nature, not

constitutional, and is clearly established by section 1981 itself. See also Hill v. Taconic

Developmental Disabilities Svcs. Ofc., 283 F.Supp.2d 955, 958 (S.D.N.Y. 2003)

(discussing qualified immunity in context of a section 1981 claim brought pursuant to

section  1983 and holding that, "[t]here can be no doubt that the law barring

discrimination against a person on the basis of race . . . is 'well-settled.'").

Next, the court must ask "whether the conduct was objectively reasonable."  Id.

"An offic[ial]'s actions are objectively reasonable if 'offic[ial]s of reasonable competence

could disagree on the legality of the defendants' actions.'"  Ford, 237 F.3d at 263

(internal citations omitted).  The court cannot rule on the reasonableness of this

conduct for qualified immunity purposes without considering the defendants' subjective

intent.   As the parties appear to agree, it must apply the standard set forth in Blue for

this purpose:

> Upon a motion for summary judgment asserting a qualified immunity
> defense in an action in which an official's conduct is objectively
> reasonable but an unconstitutional subjective intent is alleged, the plaintiff
> must proffer particularized evidence of direct or circumstantial facts, as
> suggested by Justice Kennedy's concurrence in Siegert, 500 U.S. at 236,
> 111 S.Ct. at 1795, supporting the claim of an improper motive in order to
> avoid summary judgment.  In our view, the particularized evidence of
> improper motive may include expressions by the officials involved
> regarding their state of mind, circumstances suggesting in a substantial
> fashion that the plaintiff has been singled out, or the highly unusual nature
> of the actions taken.

Blue v. Koren, 72 F.3d 1075, 1084 (2d Cir. 1995) (citing Siegert v. Gilley, 500 U.S. 226

(1991)); see Ford, 237 F.3d at 163 n.3 (applying the Blue standard); Locurto v. Safir,
264 F.3d 154, 170 (2d Cir. 2001) (holding that the Blue standard is consistent with the
Supreme Court precedent Crawford-El v. Britton, 523 U.S. 574, 585 (1998)).  Thus, a
plaintiff may make the showing required to avoid the qualified immunity bar using either
direct or circumstantial evidence, so long as it is sufficiently particularized. See Siegert,
500 U.S. at 236 (Kennedy, J., concurring); Blue, 72 F.2d at 1084.

    In the present case, because the section 1983 claim is premised on a violation of
section 1981 rather than a violation of a specific constitutional right, the court must ask
whether Baker has proffered sufficient evidence to support a claim of a motive that is
impermissible under section 1981, a motive to discriminate on the basis of race.
Baker has not proffered evidence of "expressions by the officials involved regarding
their state of mind."  Nor were any of the actions taken "highly unusual."  Viewing the
facts in the light most favorable to Baker, the defendants investigated, suspended,
terminated, and refused to rehire him for admittedly failing to take a required tour during
a night in which an inmate on his ward committed suicide and recording the tour in his
logbook as if he had completed it.  This discipline may have been harsh, but the
evidence that a handful of other "similarly situated" employees were treated differently
does not amount to particularized evidence that the actions were "highly unusual."
Moreover, although the court has found sufficient circumstantial evidence to establish a
genuine issue of material fact as to whether each of the individual defendants acted
with an intent to discriminate on the basis of race, this evidence consisted of evidence
that a small number of similarly situated individuals may have been treated more
favorably than Baker.  The court does not understand this to qualify as particularized

28

evidence of "circumstances suggesting in a <u>substantial fashion</u> that [he] has been singled out," <u>Blue</u>, 72 F.3d at 1084 (emphasis added), as would be required to "satisfy the heightened evidentiary standard," <u>id.</u> at 1085.  This is not to say that evidence that similarly situated employees were treated differently could never satisfy this standard, but in the present case, the court does not find sufficient evidence to do so.  The court therefore grants the individual defendants' motion for summary judgment on the ground of qualified immunity.

IV.     **CONCLUSION**

For the foregoing reasons, the plaintiff's motion to amend his Complaint [part of **Doc. No. 51-1**] is GRANTED, and the defendants' motion for summary judgment [**Doc. No. 48**] is GRANTED in part and DENIED in part.

The defendants' motion for summary judgment is granted as to the individual defendants Murphy, Murgeson, Quiros, and Gray.  It is also granted as to those Title VII claims premised on attempted denial of unemployment benefits.  With respect to the remainder of the plaintiff's claims against the DOC, the defendants' motion for summary judgment is denied.

The defendants' motion for summary judgment is denied as moot with respect to the following claims, which the plaintiff is not pursuing:  Count I (declaratory judgment); Count II in part, insofar as it asserted claims against defendants Jackson and Lantz; Count III in part, insofar is it asserted claims against any individual defendants in their official capacities and insofar as it stated any claim against defendant Kruk; and any claims for injunctive relief.  Therefore, the only count remaining in this case is part of Count II, insofar as that count asserts Title VII claims for monetary relief against the

DOC, premised on the plaintiff's suspension (administrative leave), termination, and denial of reinstatement to employment.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 8th day of March, 2006.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge